# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-385


**SUCCESSION OF  LAWRENCE HEYD**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 53138
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


## MARC T. AMY
## JUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Marc T. Amy, Judges.


**AFFIRMED.**

**Kenneth Michael Wright**
**203 West Clarence Street**
**Lake Charles, LA   70601**
**(337) 439-6930**
**COUNSEL FOR APPELLANT:**
     **Lawrence Heyd, Jr.**

**Russell J. Stutes, Jr.**
**Stutes & Lavergne, LLC**
**600 Broad Street**
**Lake Charles, LA   70601**
**(337) 433-0022**
**COUNSEL FOR APPELLEE:**
     **Roy Brent Young**

**AMY, Judge.**

The appellant contested his father's will to the extent it included a provision by which his father expressly disinherited his children. Citing a head injury and associated seizure activity, the appellant asserted that he is a forced heir. The trial court rejected the plaintiff's argument, finding no merit in his claim of permanent incapacity to take care of his person or administering his estate. The trial court also concluded that, even if a forced heir, the decedent had just cause for disinherison. The present appeal followed. For the following reasons, we affirm.

### Factual and Procedural Background

This matter arises within the succession proceeding of Lawrence Heyd, Sr., opened following his May 2013 death. Upon the appointment of a succession representative, the appellant, Lawrence "Tee" Heyd, Jr., filed a Rule to Invalidate Testament. Specifically, Tee challenged that aspect of Mr. Heyd's 2008 last will and testament by which he stated that:

> I further declare that all of My Children are physically and mentally capable of taking care of themselves and are not forced heirs pursuant to La. Civ. Code art. 1493 (or any successor provision).
>
> In the event any court were to judicially determine that any of my children are forced heirs pursuant to La. Civ. Code art. 1493 (or any successor provision), I further declare that My Children are intentionally disinherited and omitted from this Will as a result of a lack of contact in excess of two years, and the fact that My Children have been guilty of cruel treatment towards me as they filed a lawsuit against me during my lifetime and received a sizable settlement from me related to the lawsuit.[1]

In his rule, Tee noted that he was "gored by a goat in the left frontal area of his cranium" and that he underwent a craniotomy in 2001. He alleged that, due to the

---

[1] Much of the present record pertains to past litigation instituted by Tee against Mr. Heyd. The subject matter of the suits arose following Mr. Heyd's involvement as a plaintiff in *Corbello v. Iowa Production*, 02-0826 (La. 2/25/03), 850 So.2d 686 and following questions surrounding an inter vivos donation whereby Mr. Heyd purportedly conveyed a portion of his interest in the proceeds of that action to family members, including the appellant.

incident and the surgery, he "suffered a traumatic brain injury, with personality change, and cognitive impairment." Tee further contended that "[h]e is also subject to seizures as a result of the accident and the surgery" and explained he "has been determined to be disabled by the Social Security Administration, the State of Louisiana, and the insurer for his then employer, Citgo Petroleum Corporation." Tee also denied Mr. Heyd's suggestion that he failed to communicate with his father. Due to these factors, Tee asserted, he was entitled to have the provision of the will purporting to disinherit him declared null and void pursuant to La.Civ.Code art. 1626.[2]

Upon the Succession's challenge to Tee's claim, the matter proceeded to a two-day trial in September 2017. The trial court ultimately ruled in favor of the Succession and rejected Tee's assertion of incapacity as explained in its written reasons for ruling:

> Mr. Heyd, Jr., is not a forced heir. Pursuant to the Louisiana Civil Code article 1493, [forced heirs are descendants] of the first degree who, at the time of the death of the decedent, are twenty-three years of age or younger or descendants of the first degree of any age who, because off mental incapacity or physical infirmity, are permanently incapable of taking care of their persons or administering their estates at the time of the death of the decedent. Subsection E elaborates that the definition of "permanently incapable of taking care of their persons or administering their estates at the time of the death of the decedent" shall include descendants who, at the time of death of the decedent, have, according to medical documentation, an inherited, incurable disease or condition that may render them incapable of caring for their persons or administering

---

[2] Titled "**Defenses to disinherison**[,]" La.Civ.Code art. 1626 provides:

> A disinherison shall not be effective if the person who is disinherited shows that because of his age or mental capacity he was not capable of understanding the impropriety of his behavior or if he shows that the behavior was unintentional or justified under the circumstances. Proof of this defense must be by a preponderance of the evidence, but the unsupported testimony of the disinherited heir shall not be sufficient to establish this defense.

2

their estates in the future. A descendant's condition may fluctuate in severity and still be considered a permanent incapacity. *Succession of Ardoin*, 07-43 (La.App. 3 Cir. 05/30/07)[,] 957 So.2d 937.

The Plaintiff suffered from seizures resulting from a 2001 injuring when a goat horn penetrated his head. The Plaintiff's own evidence [e]stablishes that the episodes average three times per month and can last between seventeen (17) and forty-six (46) minutes. During these episodes, the degree of any incapacity is disputed, and Plaintiff's own testimony is inconsistent and creates credibility issues.

Mr. Heyd, Jr.'s disability, if currently existent, is minimal and does not materially affect the handling of his affairs. Dr. Domingue opined Mr. Heyd, Jr. was less than candid on his intake forms. No medical limitations have been placed on Mr. Heyd, Jr. Vocational experts also support that Mr. Heyd, Jr. does not belong to the protected categories La. C.C. art 1494 envisioned. In addition, Mr. Heyd, Jr. has not refilled his seizure medication in years.

The evidence[] adduced at trial does not meet the burden set out in La. C.C. 1493 or the case law. Mr. Heyd, Jr.'s condition is not inherited and does not render him permanently incapable of taking care of his person. While Mr. Heyd, Jr. has been diagnosed with a permanent condition that leads to short spells of incapacity, there was no evidence these spells lasted for more than an hour. Mr. Heyd, Jr. owns and operates an exotic animal breeding and sales business. This business has been run for years and has grown and expanded since conception while assisted by his wife even though she has other employment. Some of Mr. Heyd's Jr.'s work duties include traveling far distances to attend animal auctions, bidding and buying animals at these auctions, and transporting them to his farm after purchase. He is responsible for the care of these animals, which requires him to regularly feed the animals, dispense medication to the animals, and to tranquilize the animals in order for safe transport. Because these activities reflect capabilities and skills exceeding that of a person "incapable of taking care of their person or administering their estate," it is clear that Mr. Heyd, Jr. does not meet the criteria of a forced heir.

Although the trial court rejected Tee's claim of forced heir status, it found, alternatively, that even if a forced heir, his father had just cause for disinheriting him due to cruel treatment and failure to communicate.[3] *See* La.Civ.Code art. 1621.[4]

_____

[3] With regard to this alternative finding, the trial court explained:

While Mr. Heyd, Jr. does not qualify as a forced heir, a forced heir may still be disinherited if the decedent has just cause to disinherit him. La. C.C. 1494. Mr. Heyd, Jr. was properly disinherited. Louisiana Civil Code article 1621 provides the

Tee appeals that judgment,[5] arguing that:

I.       The [T]rial Court erred in its application of [La.Civ.Code art.] 1493 to the facts it found in light of the jurisprudence of the Third Circuit Court of Appeal[.]

II.      The Trial Court was manifestly erroneous in several of its findings of fact in regard to the medical issues which relate to finding Lawrence Heyd, Jr. was not a forced heir pursuant to [La.Civ.Code art.] 1493[.]

---

valid grounds for disinheris[on] of children by parents. Subsection (A)(2) states, "the child has been guilty, towards a parent, of cruel treatment, crime, or grievous injury." Subsection (A)(2) states, "the child has been guilty, towards a parent, of cruel treatment, crime, or grievous injury." Subsection (A)(8) states, "the child, after attaining the age of majority and knowing how to contact the parent, has failed to communicate with the parent without just cause for a period of two years…" The disinherited must rebut the presumptions by a preponderance of the evidence that a two year period did not exist between their age of majority and the date of the will that they knew of their parent's whereabouts and failed to communicate. *In re Succession of Gray*, 736 So.2d 902 (La App 3 Cir 2/3/99). However, the unsupported testimony of the disinherited heir shall not be sufficient to overcome the presumption. La. C.C. art. 1624.

Mr. Heyd, Jr. has failed to rebut the presumption of disinherison under either Subsection (A)(2) or (A)(8). The Court believes that suing one's own father can clearly be construed as mental cruelty pursuant to La. C.C. art. 1621(2). Mr. Heyd, Jr., sued his Father multiple times, including previously receiving a nearly $1,000.000 settlement from his Father. After he received his settlement, Mr. Heyd, Jr. sued his Father again to force him to file a gift tax return even though no returns were due at the time of the filing. The testimony adduced at trial clearly shows Mr. Heyd, Jr. failed to communicate with his father without just cause for numerous years prior to his death, and he even failed to go to his Father's funeral. Considering the evidence presented, the presumption has not been rebutted by the disinherited, and Mr. Heyd, Jr. was properly disinherited.

[4] In pertinent part, La.Civ.Code art. 1621 provides:

A. A parent has just cause to disinherit a child if:

. . . .

(2) The child has been guilty, towards a parent, of cruel treatment, crime, or grievous injury.

. . . .

(8) The child, after attaining the age of majority and knowing how to contact the parent, has failed to communicate with the parent without just cause for a period of two years, unless the child was on active duty in any of the military forces of the United States at the time.

[5] The original judgment of February 2018 included the trial court's reasons for ruling, but lacked appropriate decretal language. *See Succession of Lawrence Heyd*, 18-385 (La.App. 3 Cir. 6/27/18) (an unpublished motion opinion). Upon the lodging of the record in this court, the matter was dismissed and remanded "for the signing of a judgment with proper decretal language." *Id.* The trial court did so and signed a new judgment in July 2018. *Id.*

III.   The Trial Court erred in its application of [La.Civ.Code art.] 1621(A)(2) and (A)(8) and erred manifestly in finding Lawrence Heyd, Jr. guilty of cruel treatment and failure to communicate.

**Discussion**

*Forced Heir Status*

By his first three assignments, Tee asserts that the trial court erred both in its interpretation of the jurisprudence cited in its reasons for ruling and in its factual determinations regarding his infirmity and his capabilities. In particular, he observes that the trial court recognized his periods of incapacity, but ultimately found that those periods did not support a finding of forced heir status pursuant to La.Civ.Code art. 1493.

Regarding forced heir status, La.Civ.Code art. 1493 provides:

> A. Forced heirs are descendants of the first degree who, at the time of the death of the decedent, are twenty-three years of age or younger[6] or *descendants of the first degree of any age who, because of mental incapacity or physical infirmity, are permanently incapable of taking care of their persons or administering their estates at the time of the death of the decedent.*

(Emphasis added.)

While Tee questions the trial court's evaluations regarding his condition, the trial court's ruling reveals an overall determination of a failure of the burden of proof. In fact, and although it recognized some degree of inconsistency in Tee's relating of his purported incapacity, the trial court accepted that Tee experienced seizures as well as his assertion that they occurred several times a month, lasting from seventeen to forty-six minutes.

However, Tee contends in his brief that the trial court did not account for his testimony, or that of his wife, Dana, regarding the period of lethargy that follows each

---

[6] This first definition of forced heir is inapplicable in the present case as the record indicates Tee's birth year as 1952. Mr. Heyd died in 2013.

seizure.[7]  He thus asserts that the trial court factually erred in its determination that "there was no evidence these spells lasted for more than an hour."  Yet, review supports a differentiation in the testimony regarding the occurrence of the seizure—reported by Tee to last between seventeen and forty-six minutes—and the following period of lethargy and resulting headaches.  Certainly, the description of the two periods differed in their effect on Tee's capacity to care for himself.  As for the latter period, the evidence was general in nature, indicating that the resulting period could vary depending on the occurrence.

For instance, Dana reported that the lethargy could last from fifteen minutes to up to three days afterward.  When asked whether she had to take care of him during that period, she explained that:  "he can get up and go to the bathroom, and get a drink, or whatever, but, normally, I do try to do things for him because I can tell that he's not doing good."  No other testimony indicates that Tee's abilities were further limited so as to indicate that the trial court manifestly erred in failing to include that period in its determination that the "spell" lasted less than an hour.  It is clear that the trial court differentiated the seizure period—a period of obvious, albeit temporary incapacity—from the period that followed.  Additionally, and as a whole, review of the record supports the trial court's ultimate finding as to the period of incapacity and its ultimate finding that Tee failed to sustain his burden of proving incapacity for

---

[7] When counsel asked Tee for his perception of the seizure and how he knew that one was about to occur, Tee explained:

> Because I can't see.  I can't see that good.  It's just like looking through water running over glass, and then I start feeling like drained, I guess is the word, drained of energy, and I just get somewhere and that's it.  I get somewhere and I lay down, or I get to my chair, or get to the back seat of a truck.

Dana explained that, when experiencing the seizure, Tee would "just go[] into a zone" and that "[t]here is just no response from him."  She also described his lack of responsiveness during that time and stated that:  "It's like he goes into a zone.  I can walk over and try to speak to him, and it's like he doesn't even recognize I'm even there."

purposes of La.Civ.Code art. 1493(A). *See Succession of Forman*, 09-1455, p. 2 (La.App. 3 Cir. 5/5/10), 37 So.3d 1081, 1083 ("A trial court's consideration of the factual circumstances and severity of a potential forced heir's capacity to care for herself or administer her estate is subject to the manifest error/clearly wrong standard of review."), *writ denied*, 10-1100 (La. 9/3/10), 44 So.3d 684.

As pertinent in this case, forced heirs are those who "because of mental incapacity or physical infirmity, are permanently incapable of taking care of their persons or administering their estates at the time of the death of the decedent." La.Civ.Code art. 1493(A). Tee, however, presented little in the way of medical testimony or documentation regarding his condition. He instead introduced various medical records resulting from his treatment and the testimony of his family practitioner, Dr. Carl Nabours. While Dr. Nabours characterized Tee's condition as "chronic" in that it will not go away, he further explained that it was his understanding that Tee was only incapacitated during the time period of the seizure. Dr. Nabours denied that Tee was mentally or physically incapacitated and acknowledged that he could take care of his own affairs. Given his treatment of Tee in his capacity as a family practitioner, Dr. Nabours explained that he did not know the details regarding the seriousness of the underlying condition and explained that he had no evidence that Tee was taking medication to control the seizure activity. When pointedly asked whether he had seen anything to "believe he's permanently incapable of taking care of himself or handling his own affairs on a regular basis[,]" Dr. Nabours replied: "I have not seen it myself, no." He denied claiming that Tee was permanently incapable of caring for himself. Dr. Nabours instead deferred to Tee's neurologist, Dr. Fayez Shamieh, on that question. Dr. Shamieh did not testify, however.

7

In opposition, the Succession presented expert testimony from Dr. James Domingue, a neurologist, who evaluated Tee and considered his medical records as submitted. Dr. Domingue denied that Tee had incapacity as demonstrated by his independent existence, a circumstance discussed below. Furthermore, Dr. Domingue denied that he found in the medical documentation that Tee was, in fact, diagnosed with a seizure disorder. And, even given such a condition, Dr. Domingue opined that it is potentially controllable with medication and, possibly, surgery. He denied that the condition should worsen and explained that he had no reason to believe that Tee will suffer from incapacity in the future.

Similarly, Dr. Megan Ciota, an expert in the field of clinical psychology and neuropsychology, explained that following two days of testing and evaluation, she identified no disability that would impair Tee "from being able to self-determine his day-to-day life, his legal matters, his finances, you know, sexual consent, and the like." That conclusion was reached even with Tee's description of the seizures and his feeling "drained" afterwards. She explained that "because an individual may have a relative, diminished ability doesn't make them not able to do those things and to guide their own lives." As with Dr. Domingue, Dr. Ciota's review of the submitted medical records did not reveal a diagnosis of a seizure disorder, although Tee self-reported that condition.

As its final expert, the Succession presented Dr. Larry Stokes, accepted as an expert in the field of rehabilitation counselor and mental health counselor. Dr. Stokes testified that, following testing and evaluation, he concluded that Tee is "completely employable" given the information available to him. Dr. Stokes reported identifying neither mental nor physical limitations in the records available and explained that Tee could still be competitively employable. In fact, Dr. Stokes found no documentation

indicating that he could not return to his former work as a pipefitter. Because of his current employment, Dr. Stokes explained, Tee is not eligible for rehabilitation services.

Finally, and although Tee's brief to this court focuses upon the trial court's findings regarding the length of his periods of disability, it is important to recognize the trial court's additional observations regarding Tee's demonstrated ability to function in his own business and to earn an income.[8] As noted by the trial court, Tee, along with his wife, operates an exotic animal breeding business. Tee testified at length regarding his work on their two farms, including his out-of-state travels and various activities associated with the breeding, selling, and care of the animals. While Tee and Dana both explained that she is responsible for the "paperwork" associated with business, their testimony is clear regarding Tee's active participation in the business. In fact, Dr. Nabours explained that Tee assists him at times on his own farm. Each of the experts testified regarding their impression regarding Tee's ability to continue his work in the shaping of their opinion. As noted by the trial court, such "activities reflect capabilities and skills exceeding that of a person 'incapable of taking care of their person or administering their estate[.]'"

Further, that balance of negligible medical documentation in support of Tee's position against positive evidence regarding his continued abilities distinguishes this matter from the jurisprudence advanced in the appellant's brief. *See Stewart v. Estate of Stewart*, 07-333 (La.App. 3 Cir. 10/3/07), 966 So.2d 1241; *Succession of Ardoin*, 07-43 (La.App. 3 Cir. 5/30/07), 957 So.2d 937, *writ denied*, 07-1332 (La. 9/28/07), 964 So.2d 360. While both cases involved heirs who experienced periods of varying

---

[8] The Succession introduced Tee and Dana's wage information by way of summary and by tax return. Tee did not dispute that the gross income from their exotic animal business was $347,811 in the year of his father's death and that its net income was $64,156.

incapacity and were ultimately determined to be forced heirs, the remainder of the factual backgrounds of those cases are at odds with that in the present case. First, both *Stewart* and *Ardoin* addressed claims of forced heir status given the heirs' respective diagnoses of bipolar disorder, a condition described in the reporting of the cases as an inherited disorder. The heirs in both cases presented expert testimony regarding the permanency and incurable nature of their condition. Neither heir was able to maintain gainful employment. The panels in both *Stewart* and *Ardoin* remarked that the successions opposing forced heir status failed to rebut the heirs' evidence of incapacity.

Obviously, the evidence of both infirmity and capability differs in the present case. For these reasons, and following review of the record, we find no manifest error in the trial court's rejection of the forced heir claim.

*Cause for Disinherison*

By his final assignment of error, Tee questions the trial court's determination that he was guilty of cruel treatment and failure to communicate for purposes of La.Civ.Code art. 1621. Our above determination that the record supports the trial court's rejection of Tee's claim as a forced heir pretermits our consideration of this alternative finding. *See Cat's Meow, Inc. v. City of New Orleans ex rel. Dep't of Fin.*, 98-0601, p. 8 (La. 10/20/98), 720 So.2d 1186, 1193 (wherein the supreme court explained that: "The jurisprudence of this Court is well settled that courts will not decide abstract, hypothetical or moot controversies, or render advisory opinions with respect to such controversies."). Accordingly, we do not address this assignment.

**DECREE**

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this proceeding are assessed to the appellant, Lawrence Heyd, Jr.

**AFFIRMED.**